AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| | |
|---|---|
| United States of America<br>v.<br><br>THOMAS HENRY BROOKS, JR.<br><br>_Defendant(s)_ | )<br>)<br>) Case No.<br>)   3:18MJ 173<br>)<br>)<br>) |

**FILED NOV -7**
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 15, 2015__ in the county of __Henrico__ in the __Eastern__ District of __Virginia__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Special Agent Joseph P. Quinn, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __November 7, 2018__

/S/
David J. Novak
United States Magistrate Judge
_Judge's signature_

City and state: __Richmond, Va.__

Hon. David J. Novak, U.S. Magistrate Judge
_Printed name and title_



## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT AND ARREST WARRANT

I, Joseph P. Quinn, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION

1. I have been employed as a Special Agent of the FBI since 1999. I have primarily investigated criminal matters concerning violations of federal laws commonly referred to as "white collar crimes," such as financial institution fraud, investment fraud, securities fraud, mortgage fraud, fraud by wire and mail fraud (18 U.S.C. §§ 1341 *et seq.*). I have executed numerous search warrants and have made numerous arrests throughout my career as a law enforcement officer. As a Special Agent of the FBI, I am authorized to investigate violations of federal law and submit this affidavit.

2. I make this affidavit in support of a criminal complaint and an application for an arrest warrant for THOMAS HENRY BROOKS, JR., date of birth XX/XX/1965, Social Security Number XXX-XX-9447 (hereinafter "BROOKS"), for violations of 18 U.S.C. § 1343, wire fraud, as more fully described in this affidavit.

3. I am aware that 18 U.S.C. § 1343 makes it a crime to use interstate wire communications to execute a scheme to defraud.

4. I am familiar with the facts and circumstances of this investigation through my personal participation, discussions with agents of the FBI and other law enforcement agencies, my review of records and reports relating to this investigation, and discussions with involved witnesses and victims. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to

1

establish probable cause to believe that BROOKS has a committed violation of 18 U.S.C. § 1343.

## PROBABLE CAUSE

5. In summary, my investigation has revealed that from in or about January 2014 to in or about August 2016, BROOKS operated an advanced fee scheme in which BROOKS operated two lending brokerages within the Eastern District of Virginia. BROOKS required advanced fees from clients in order to broker or offer the loans. BROOKS made misrepresentations to clients about his businesses' histories and record of success, as well as his ability to broker and/or provide direct loans to clients. BROOKS also misrepresented his use of clients' advanced fees, falsely claiming that he would use the money to pay third-party expenses to obtain the loans.

6. To date, my investigation has revealed that BROOKS accepted approximately $722,324.25 in advanced fees for loans from 28 victims.

### XSY Technologies/Commercial Capital Services

7. My investigation has revealed that BROOKS was the president and CEO of XSY Technologies/Commercial Capital Services ("XSY") in Virginia Beach, Va., within the Eastern District of Virginia. I have reviewed emails from BROOKS during 2014-15 in which he lists his title as "President | Chief Executive Officer" of XSY, his email at the domain @xsytechnologies.com, and the XSY website as <www.xsytechnologies.com>. In addition, BROOKS was the sole signatory on the XSY bank account, which had activity only from January 2014 to October 2015.

8. During my investigation, I interviewed D.T., a client of XSY, who resides outside of the Commonwealth of Virginia. In or about 2014, other loan brokers introduced D.T. to

BROOKS and XSY, as D.T. sought to obtain financing for a business project. Before doing business with XSY, D.T. reviewed the XSY website and spoke personally with BROOKS and, as a result, D.T. believed that XSY had been successful in obtaining funding for other clients. Specifically, BROOKS told D.T. that XSY's deals were so large that BROOKS had to obtain greater amounts of financing.

9. In reliance on the website and BROOKS's assurances, D.T. agreed to do business with XSY. On or about July 15, 2014, BROOKS provided a "commitment letter" to D.T., in which BROOKS and XSY promised that if D.T.'s business provided $15,000 to XSY, then XSY would fund and close a bridge loan of $1 million so that D.T. could secure property. BROOKS also agreed to fund and close complete financing of $73 million if D.T.'s business provided $25,000 to XSY. D.T. made the $15,000 payment and the $25,000 payment to XSY on July 16, 2014 and July 18, 2014, respectively. BROOKS did not close the bridge loan and instead asked for more money from D.T.

10. D.T. provided me with numerous emails between him and BROOKS from 2014 to early 2015, in which BROOKS made excuses for the delays, requested more money, and claimed to be working with funders to get deals closed. D.T. also requested the names of the funders, but BROOKS refused to identify them. In total, D.T.'s company paid $95,000 to XSY for advanced fees in an effort to obtain funding. Of these funds, D.T. paid $30,000 by wire in two transfers on December 4 and 9, 2014. BROOKS failed to provide or secure any funding for D.T. and refused to return any of his fees.

11. In or about December 2014, D.T. traveled to Virginia Beach, Virginia, and met in person with BROOKS. D.T. described BROOKS as a tall black man with a growth on his ear, which is consistent with the information and photographs of BROOKS that I have reviewed. In

3

March 2015, D.T. sent a letter to BROOKS that outlined the entire chronology and requested a return of his $95,000. BROOKS never responded and refused to communicate with D.T. thereafter.

12. In truth and fact, as BROOKS well knew, he lied to D.T. to obtain his upfront fees and did not obtain the financing as promised. First, the XSY website contained false representations about the company's history and success. I have reviewed the XSY website from March 2015, as captured by the Wayback Machine, or Internet Archive, a service that compiles archives of websites and digital collections.[1] The XSY website stated that it "is a Direct Private Investor, Commercial Brokerage and Commercial Capital Advisory Consulting Firm which provides services Domestic [sic] and Internationally since 1985." It also stated that it had "over 1,500 angel investor group[s], 3,000 private investors firms, 970 family offices with $150 Billion of assets under management, and over 2,700 venture capital and private equity firms." The website also touts "NO UPFRONT FEES." In truth and fact, I believe that XSY has not been operational since 1985. Its bank account was maintained from January 2014 to October 2015—not 1985. In addition, the Wayback Machine has not archived any XSY websites before 2014.

---

[1] The Wayback Machine, available at <https://archive.org/web/>, has electronic programs called "crawlers," that are written and designed to go out into the world wide web, identify individual files that were uploaded to the internet, and capture a record of those files, take a record of the source code that tells browsers what to display when someone requests a webpage. The crawlers are automated. The Wayback Machine then assigns it a date code that tells us when that record was captured, and the Wayback Machine processes that in a way so that people can visit their online database, click on a link, and get a record for a specific website for a specific web page at a specific point in time.
    The new Rule 902(13) of the Federal Rules of Evidence considers certified records generated by electronic process or system, such as the Wayback Machine, as self-authenticating, if "shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."

13. In addition, as BROOKS well knew as the sole signatory on the bank account, XSY did not have any transactions in which XSY invested funds in clients' projects. Nor did the XSY account have any payments consistent with a loan broker (*e.g.*, payments to appraisers or credit reporting agencies), though BROOKS did spend some money on XSY business expenses, including rent for XSY office space and advertisements. By contrast, my review of the XSY bank account reflects that BROOKS used the majority of the funds for personal expenses, including rent, utilities, restaurants, and retail. For example, BROOKS used the XSY debit card to spend over $2,000 at the Williamsburg, Va., Polo Ralph Lauren Outlet on or about May 17, 2014. My review of the XSY bank account does not reveal that BROOKS took any steps to obtain funding for D.T. during the time period in which D.T. continued to pay advanced fees, as promised.

14. My review of the XSY bank account also shows that 13 other individuals paid XSY approximately $213,373 in fees from May 16, 2014 to March 30, 2015. An additional individual that I was able to contact told me that they paid BROOKS advance fees for loans but the loans did not close. An additional individual filed a complaint with the FBI reporting that they paid XSY advance fees for a loan but the loan did not close. The Complainant stated that BROOKS was the "funds manager" for XSY.

**Peach Capital Partners**

15. My investigation also has revealed that BROOKS ran a similar fraudulent scheme during an overlapping time period. BROOKS was the president and CEO of Peach Capital Partners ("Peach Capital") in Richmond, Va. (Henrico County), within the Eastern District of Virginia. I have reviewed emails from BROOKS during 2015-16 in which he lists his title as "President | Chief Executive Officer" of Peach Capital, his email at the domain

@peachcapitalpartners.com, and the Peach Capital website as <www.peachcapitalpartners.com>. In addition, BROOKS was the sole signatory on the Peach Capital bank accounts, which had activity only from November 2014 to August 2016.

16.     During my investigation, I interviewed M.S., a client of Peach Capital, who resides outside of the Commonwealth of Virginia. Like D.T., M.S. was referred to Peach Capital by other loan brokers in or about October 2015, in order to obtain financing for a business project. Before doing business with Peach Capital, M.S. reviewed the Peach Capital website. When I spoke with M.S., he recalled that the Peach Capital website had testimonials from former clients and a slide show that contained photos of large real estate project, such as big apartment buildings, that were recently funded through Peach Capital. M.S. stated that the real estate projects on the slide show looked like they cost tens of millions of dollars. The website also contained documents for clients to fill out and a drop box in which clients could electronically provide documents to Peach Capital. BROOKS also told M.S. that he was very successful at obtaining loans for clients and could obtain a loan in 30 to 60 days. Based on all of this, M.S. felt comfortable doing business with BROOKS and Peach Capital.

17.     M.S. sought a $3 million business loan. After talking with BROOKS, M.S. understood that Peach Capital would loan 75% of the refinance loan to M.S.'s company, with the remainder of the funds coming from venture capital; however, Peach Capital Partners would guarantee the entire loan. The loan for capital improvements, approximately $800,000, would come from venture capital. The entire loan, including the refinance loan and the loan for capital improvements, totaled approximately $3 million.

18.     On or about November 15, 2015, M.S. wire transferred Peach Capital $5,000 to begin the loan process, and five days later M.S. wire transferred an additional $20,000 for due

diligence and administrative fees. The "commitment letter" that BROOKS sent to M.S. on or about November 16, 2015, which explained the terms and conditions of the purported funding, noted that M.S.'s fees would be used only for "out-of-pocket expenses" actually incurred by Peach Capital in obtaining the funding, such as "due diligence, consulting and legal fees."

19. In or about January 2016, BROOKS told M.S. that the loan would take another 60 days, but offered to obtain a bridge loan. M.S. agreed and wire transferred another $10,000 to Peach Capital on or about March 1, 2016, allegedly for associated fees. None of the loans ever closed and eventually by on or about May 2015, BROOKS stopped responding to M.S.'s emails and phone calls.

20. In truth and fact, as BROOKS well knew, he lied to M.S. to obtain his upfront fees and did not obtain the financing as promised. First, the Peach Capital website contained false representations about the company's history and success. I have reviewed the Peach Capital website images from 2015 and 2016, as captured by the Wayback Machine. It is consistent with how M.S. described it and much of the text is identical to the text on the XSY website. The Peach Capital website stated that it "is a Direct Private Investor, Commercial Brokerage and Commercial Capital Advisory Consulting Firm which provides services Domestic [sic] and Internationally since 1985." The website also stated that it had "over 1,500 angel capital group[s], 3,000 private investors firms, 970 family offices with $150 Billion of assets under management, and over 2,700 venture capital and private equity firms." In truth and fact, I believe that Peach Capital has not been operational since 1985. BROOKS registered the Peach Capital website in August 2015 and he was the sole signatory on the Peach Capital bank accounts, which had activity only from November 2014 to August 2016.

21. In addition, as BROOKS well knew as the sole signatory on the bank account, Peach Capital did not have any transactions in which Peach Capital invested funds in clients' projects. I also examined the Peach Capital bank account to determine what happened to M.S.'s final $10,000 payment in March 2016. These funds were used exclusively for personal expenses. The balance in the account was $1,944 prior to the $10,000 wire from M.S. In the following month, the funds were depleted from the account by cash withdrawals ($2,765.95) and transfers to a second Peach Capital account ($9,687.27), leaving a balance on by April 4, 2016, of $3.34. From this second Peach Capital account, BROOKS spent over $3,470 on retail, and the remainder on other seemingly personal expenses, such as entertainment, spas, restaurants, and grocery stores.

22. The Peach Capital website had a list of testimonials from purported former clients and professionals who worked with the company in the past, such as:

> "I own a bar/nightclub. I couldn't locate any local lender willing to finance this type of property. Peach Capital Partners came through for me despite the fact that my business has only been open for a short time. Thank You!" Fernando S., Virginia Beach, VA

23. The Peach Capital bank records do not record any relationship with Fernando S. or any of the other individuals listed in the testimonials. Of the 14 clients identified in the Peach Capital bank records, 11 have been interviewed or otherwise provided information. None of the clients identified through bank records are listed under the testimonial section of the website.

24. The 11 Peach Capital clients described interactions with BROOKS that were similar to M.S.'s and they never obtained funding. For example, in or about September 2015, D.R. wire transferred $15,000 to Peach Capital in order to secure a $9 million commercial loan. Before doing this, D.R. reviewed the Peach Capital website and saw a history of past success in obtaining funding. He also spoke with BROOKS, who told D.R. that Peach Capital had funded

8

hundreds of millions of dollars for similar projects. Based on D.R.'s "commitment letter" and his conversations with BROOKS, D.R. believed that his funds were going to out-of-pocket fees to pay third party expenses incurred by Peach Capital. In truth and fact, BROOKS spent D.R.'s $15,000 on personal expenses and cash withdrawals not related to obtaining funding.[2] BROOKS never funded D.R.'s loan and never returned his money.

25. In total, 14 clients paid Peach Capital $413,950.50 in fees from September 1, 2015 to June 6, 2016.

26. I also interviewed Employee #1, who was BROOKS's primary employee at Peach Capital from in or about August 2015 to in or about January 2016. Employee #1's job was to contact brokers to encourage them to send clients to Peach Capital in exchange for a fee. Employee #1 stated that no loans closed during his/her period of employment. Employee #1 also described conference calls in which he/she heard BROOKS telling brokers and clients that Peach Capital had closed 50 deals, but could not provide references or specific information. When Employee #1 quit, he/she told BROOKS, in substance, "If you are running a scam, I don't want to be a part of it." BROOKS did not respond.

---

[2] More specifically: on August 25, 2015, the Peach Capital bank account had a balance of zero. D.R.'s $15,000 deposit was commingled with $90,000 from other clients over the following two months. Until October 23, 2015, the $105,000 from clients is depleted from the account. Approximately $51,000 is withdrawn in cash, $17,000 is paid for a "legal order," $230 is spent on bank fees, and $37,000 is transferred to the other Peach Capital account. From that $37,000 in the other Peach Capital account, BROOKS spends it all on what appear to be personal expenses—including retail, utilities, restaurants, salons, entertainments, medical expenses, and grocery stores.

## CONCLUSION

27. Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause of believe that THOMAS HENRY BROOKS, JR. committed Wire Fraud, in violation of 18 U.S.C. § 1343; that is, he devised or intended to devise a scheme and artifice to defraud, and obtained money and property by means of false or fraudulent pretenses, representations, and promises, and caused to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, and signals for the purpose of executing such scheme and artifice. Your Affiant, therefore, respectfully requests that a criminal complaint and arrest warrant be issued in the Eastern District of Virginia for THOMAS HENRY BROOKS, JR.

Joseph P. Quinn
Special Agent
Federal Bureau of Investigation

Reviewed and approved:

Jessica D. Aber
Assistant United States Attorney

Sworn and subscribed before me this 7th day of November, 2018.

/S/
David J. Novak
United States Magistrate Judge

10